1  Reed R. Kathrein (139304)
   Peter E. Borkon (212596)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone: (510) 725-3000
4  Facsimile: (510) 725-3001
   reed@hbsslaw.com
5  peterb@hbsslaw.com

6  Steve W. Berman
   Sean R. Matt
7  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
8  Seattle, WA 98101
   Telephone: (206) 623-7292
9  Facsimile: (206) 623-0594
   steve@hbsslaw.com
10 sean@hbsslaw.com

11

E-filing          *JCS**

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

12

13

14  JERRY SMIT, individually and on behalf of all    Case No.  **CV 10 3971**
    others similarly situated,

15                                    Plaintiff,      COMPLAINT FOR VIOLATION OF
                                                      CALIFORNIA BUS. & PROF. CODE
16          v.                                        § 17200

17  CHARLES SCHWAB & CO., INC., SCHWAB
    INVESTMENTS and CHARLES SCHWAB
18  INVESTMENT MANAGEMENT, INC.,

19                                   Defendants.

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF UCL

010201-11 393389 v1

1    Plaintiff, for her Class Action Complaint, alleges the following upon personal knowledge as

2    to herself and her own acts, and as to all other matters upon information and belief, based upon the

3    investigation made by his attorneys, which included, *inter alia*, a review of Securities and

4    Exchange Commission ("SEC") filings, news reports and other publicly available materials.

5                    **I.       NATURE OF THE ACTION**

6    1.       Plaintiff brings this action against members of the Charles Schwab financial

7    services family on behalf of persons who owned shares of the Schwab Total Bond Market Fund

8    (the "Fund") (Ticker:  SWLBX) as of May 31, 2007.

9    2.       The action is brought against defendants for causing the Fund to deviate from its

10   fundamental investment objective to track the Lehman Brothers U.S. Aggregate Bond Index (the

11   "Index") (Ticker: LBUSTRUU).  Section 8 of the Investment Company Act of 1940 (the "ICA")

12   directs an investment company to recite in its Registration Statement "all investment policies of the

13   registrant ..., which are changeable only if authorized by shareholder vote," as well as all policies

14   that "the registrant deems matters of fundamental policy."  15 U.S.C. § 80a-8(b) (2) & (3).  Section

15   13 prohibits a registered investment company from deviating from any such policies "unless

16   authorized by the vote of a majority of its outstanding voting securities."  15 U.S.C. § 80a-13.  By

17   violating Section 13, defendants committed a per se violation of the California Unfair Competition

18   Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL").

19   3.       The Fund deviated from its stated investment objective by investing a material

20   percentage of its portfolio in high risk non-agency collateralized mortgage obligations ("CMOs").

21   The non-agency CMOs were not part of the Index and were substantially more risky than the U.S.

22   agency securities and other instruments that comprised the Index.

23   4.       The Fund also deviated from its stated fundamental investment objective by

24   investing more than 25% of its total assets in non-agency mortgage-backed securities and CMOs.

25   The Fund's investment objectives prohibited any concentration of investments greater than 25% in

26   any industry (other than if necessary to track the Index).

27   5.       Defendants' deviation from the Fund's investment objective exposed the Fund and

28   its shareholders to tens of millions of dollars in losses stemming from a sustained decline in the

COMPLAINT FOR VIOLATION OF UCL                    - 1 -

1　　value of non-agency mortgage-backed securities. The Fund's deviation from its stated investment

2　　objective caused investors to suffer a negative 12.64% differential in total return for the Fund

3　　compared to the Index for the period August 31, 2007, through February 27, 2009, consisting of a

4　　negative total return of 4.80% for the Fund compared to a positive total return of 7.85% for the

5　　Index over that same period (including interest payments).

## II.  JURISDICTION AND VENUE

6.　　This Court has jurisdiction over the subject matter of this action under 28 U.S.C.
§§ 1332(d)(2), and 1367. The plaintiff is diverse from at least one of the defendants and the
amount in controversy exceeds $5 million.

7.　　Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Many of the acts
giving rise to the violations of law complained of herein, including the dissemination to
shareholders of the Registration Statements, Proxy Statements, and Prospectuses, referenced herein
occurred in this District.

8.　　Intradistrict Assignment: Assignment to the San Francisco or Oakland division of
this Court is appropriate because Defendants' headquarters and principal place of business is in San
Francisco, California. Because this action arises in the county of San Francisco, pursuant to
Northern District of California, Local Rule 3-2(d), assignment to the San Francisco or Oakland
Division is proper.

## III.  PARTIES

9.　　Plaintiff Jerry Smit is a resident of Arvada, Colorado. Beginning in October 1998,
and continuing through July 2010, Mrs. Smit purchased shares of the Schwab Total Bond Market
Fund, through both regular share purchases and reinvestment of dividends. Mrs. Smit presently
holds approximately 546.07 shares of the Fund. Mrs. Smit suffered damage as a result of
defendants' violations of the California Unfair Competition Law.

10.　　Defendant Charles Schwab & Co., Inc. ("Schwab" or "Underwriter") is
headquartered at 101 Montgomery Street, San Francisco, CA 94104. Schwab is the parent
company of Schwab Investments. Pursuant to a Distribution Agreement, Schwab was, during the

COMPLAINT FOR VIOLATION OF UCL　　　　　- 2 -

1   relevant time period, the principal underwriter and distributor for shares of the Fund and was the

2   Trust's agent for the purpose of the continuous offering of the Fund's shares.

3        11.    Defendant Charles Schwab Investment Management, Inc., also known as Charles

4   Schwab Investment Management Services ("CSIM" or the "Investment Advisor"), is also

5   headquartered at 101 Montgomery Street, San Francisco, CA 94104. Schwab Management is the

6   asset management arm of The Charles Schwab Corporation, with over $200 billion in assets under

7   management. Schwab Management oversees the asset management and administration of the Total

8   Bond Market Fund. As compensation for these services, Schwab Management receives a

9   management fee from the Fund.

10       12.    Defendant Schwab Investments ("Issuer," "Trust" or "Registrant") also has its

11  headquarters at 101 Montgomery Street, San Francisco, CA 94104. Schwab Investments was

12  organized under Massachusetts law on October 26, 1990, and is a Massachusetts Business Trust. It

13  is the Registrant for the Total Bond Market Fund, the issuer of Fund shares, and performed trust

14  services for the Fund. The Total Bond Market Fund is a series of the Trust.

15       13.    Schwab, CSIM, and the Trust are under the common control of The Charles Schwab

16  Corp., a publicly traded corporation.

17       14.    The relationship between the foregoing entities and the Fund is depicted in the

18  following diagram:

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF UCL                    - 3 -

010201-11 393389 v1

## IV.   SUBSTANTIVE ALLEGATIONS

**A.   Background and History Prior to the 1997 Shareholder Vote**

15.    The Schwab Total Bond Market Fund (SWLBX) was initiated on March 5, 1993, under a predecessor name – the Schwab Long-Term Government Bond Fund (the "Government Bond Fund") – as an actively managed bond fund.

16.    According to the Prospectus for the Government Bond Fund dated December 30, 1994, as amended June 30, 1995, the investment objective of the Government Bond Fund was "to provide a high level of current income consistent with preservation of capital by investing primarily in securities issued or guaranteed by the United States Government, its agencies or instrumentalities and repurchase agreements covering those securities."

1  17.   The June 30, 1995 Prospectus also stated that "[the] Fund's investment objective ...

2  is fundamental and cannot be changed without approval by holders of a majority of the Fund's

3  outstanding voting shares."

4  18.   The Prospectus added that "U.S. Government Securities are generally viewed by the

5  Investment Manager as being among the safest of debt securities with respect to the timely

6  payment of principal and interest...."

7  19.   Schwab was unable to successfully market the Government Bond Fund.

8  20.   As of August 31, 1997, after more than four years of operations, the Government

9  Bond Fund only had $24.8 million in investment assets.

10  **B.    The Formation of the Schwab Total Bond Market Index Fund**

11  21.   On July 25, 1997, Schwab Investments mailed to investors in the Government Bond

12  Fund a Proxy Statement on SEC Form 14A with respect to a shareholder vote "[t]o amend [the]

13  Fund's fundamental investment objective resulting in changing the Fund from [a] Government

14  bond fund[] to [a] bond index fund[] that would include Government and other fixed income

15  securities" (at 2).

16  22.   The Proxy Statement (at 14) informed investors that the Board of Trustees of the

17  Fund was proposing to change the Fund's then existing investment objective from attempting "to

18  provide a high level of current income consistent with preservation of capital by investing

19  primarily in securities issued or guaranteed by the U.S. Government" to a "proposed investment

20  objective ... to attempt to provide a high level of current income consistent with preservation of

21  capital by seeking to track the investment results of a particular bond index through the use of an

22  indexing strategy."

23  23.   The Proxy Statement added (at 3) that "[i]f its proposed investment objective is

24  approved, the Total Bond Fund would invest in a portfolio of fixed-income securities that seeks to

25  track the Lehman Brothers Aggregate Bond Index."

26  24.   The Lehman Index was described in the Proxy Statement (at 18) as "a broad market-

27  weighted index which encompasses the following classes of investment grade fixed-income

28

COMPLAINT FOR VIOLATION OF UCL                - 5 -

1    securities: U.S. Treasury and agency securities, corporate bonds, international (dollar-

2    denominated) bonds, agency mortgage-backed securities, and asset-backed securities."

3        25.    The Lehman Index is a proprietary Lehman Brothers index, consisting of over 9,000

4    separate instruments whose exact composition is not generally available to investors. The

5    composition of the Index changes from time-to-time. It is now called the Barclay's U.S. Aggregate

6    Bond Index.

7        26.    The Proxy Statement stated with respect to mortgage-backed securities and asset-

8    backed securities (at 21) that "[t]he primary risk of these securities is 'prepayment risk.' Namely

9    that during periods of changing interest rates, the payment streams in the underlying pools will be

10   paid faster ... than anticipated."

11       27.    The Proxy Statement further described (at 22) the "investment process of indexing"

12   by stating that the Fund "would be unable to hold all of the individual issues which comprise the

13   [Index] because of the large number of securities in the [Index]," but that the "Fund would hold a

14   portfolio of fixed-income securities that is managed to *closely approximate* [the] Index's

15   'characteristics' of coupon rate, duration, sector, quality and optionality (or convexity)":

16               If the proposed investment objective is approved, the Funds would
                 not be managed according to traditional methods of "active"
17               investment management, which involve the buying and selling of
                 securities based upon economic, financial, and market analyses and
18               investment judgment. Instead, the Investment Manager would utilize
                 a "passive" or "indexing" investment approach, to attempt to track
19               the investment performance of each Fund's Index through statistical
                 sampling and other procedures. The Funds would be unable to hold
20               all of the individual issues which comprise the Indexes because of
                 the large number of securities in the Indexes. Each Fund would hold
21               a portfolio of fixed-income securities that is *managed to closely
                 approximate* its Index's 'characteristics' of coupon rate, duration,
22               sector, quality and optionality (or convexity). [Emphasis added.]

23       28.    The Proxy Statement assured investors (at 22) that "[b]efore purchasing or selling a

24   security, the Investment Manager would analyze each security's characteristics and determine

25   whether purchasing or selling the security would help the Fund's portfolio *approximate* the

26   characteristics of the Index":

27               Before purchasing or selling a security, the Investment Manager
                 would analyze each security's characteristics and determine whether
28               purchasing or selling the security would help the Fund's portfolio

COMPLAINT FOR VIOLATION OF UCL            - 6 -

1         *approximate the characteristics of the Index. As a result, when the Fund's portfolio as a whole is considered, the Fund's performance and risk is expected to be similar to its Index's performance and risk.*

2

3         For example, with respect to the "sector characteristic," if U.S.

4         Treasury and agency securities represent approximately 60% of an Index's interest rate risk, then approximately 60% of the respective

5         Fund's interest rate risk would come from such securities. Similarly, if corporate bonds represent 20% of the Fund's interest rate risk, then

6         they would represent approximately 20% of the Fund's interest rate risk. This technique is expected to enable each Fund to track the

7         coupon income and price movements of its respective Index, while minimizing transaction, custodial and accounting costs. [Emphasis

8         added.]

9         29.    The 1997 Proxy Statement represented (at 23) that the Investment Manager would

10 seek a 90% correlation between the Fund and the Index:

11         Over the long term, the Investment Manager will seek a correlation between the performance of each Fund, as measured by its net asset

12         value, including the value of its dividend and capital gain distributions, and that of its Index of 0.9 or better. A correlation of

13         1.0 would indicate perfect correlation, but since each Fund incurs operating expenses, unlike its respective Index, a perfect correlation

14         is unlikely to be achieved. The Investment Manager will monitor the performance of each Fund versus that of its Index on a regular basis.

15         If a tracking error develops, each Fund is rebalanced to help bring it in line with the Index. In the unlikely event that a correlation of 0.9

16         or better is not achieved, the Board of Trustees of a Fund will consider alternative arrangements.

17

18         30.    The 1997 Proxy Statement described (at 2) Schwab's rationale for proposing that

19 the Fund be changed to an index fund and the Fund's appeal to passive investors who were seeking

"broad bond portfolio diversification" and "a consistent investment style," as follows:

20

21         Schwab has long been an advocate of indexing as an investment strategy. The Board of Trustees believes the proposed bond index

22         funds will offer customers many benefits through the use of an indexing strategy. These benefits include: broad bond portfolio

23         diversification, a consistent investment style, and potentially lower trading costs as a result of lower portfolio turnover and fewer

24         transactions, over the long term. And, all other things being equal, lower costs can translate into higher returns.

25         The objective of an index fund, unlike an actively managed fund, is to closely track the total return of a benchmark or index for a

26         particular market, or market sector. Because both proposed Funds plan to invest in a larger number and broader range of bonds, the

27         Funds should provide investors a more broadly diversified bond fund investment for their asset allocation plan. The proposed bond index

28         funds could represent excellent choices for the core component of an

1    investor's bond fund holdings and could fulfill the bond portion of an
     asset allocation plan, whether that plan calls for a longer-term or
2    short-term bond fund.

3    31.    The 1997 Proxy Statement (at 2) stated that because investors would not be required

4    to actively monitor and assess the investment selections of the Fund's Investment Advisor (which

5    was charged with the responsibility of following the Index), the bond index fund "should gave a

6    broader appeal to a larger number of investors."

7    In addition, the Board of Trustees believes that the proposed bond
     index funds should have a broader appeal to a larger number of
8    investors. This would permit the Funds to be marketed more
     effectively, creating economies of scale if assets grow. These
9    economies could be achieved by spreading the Funds' fixed costs
     over a larger asset base, which would potentially lower the Funds'
10   operating expenses.

11   32.    The Proxy Statement sought to assure investors (at 4) that the change to an indexing

12   strategy would not then increase the risk profile of the Fund because 80% of the Fund's assets

13   would still be invested on a current basis in U.S. government or agency bonds, and given the then

14   current composition of the Index, 15% of the portfolio would be invested in investment grade

15   corporate bonds, 4% in international (dollar-denominated bonds), and 1% in asset-backed

16   securities:

17   As shown in the two preceding charts, as of June 30, 1997, both of
     the proposed index Funds would maintain significant positions in
18   U.S. Treasury and agency, and agency mortgage-backed securities –
     85.0% for the Short-Term Bond Market Index Fund and 80.0% for
19   the Total Bond Market Index Fund.

20   The non-U.S. Treasury/agency securities represented in both indices
     are all investment grade and quite diversified. As a result, both index
21   Funds are expected to maintain relatively low levels of credit risk.
     However, given that U.S. Treasury and agency securities have the
22   lowest credit risk compared to other types of fixed income securities,
     the portfolio management team anticipates that the proposed Funds
23   would have a slightly higher level of credit risk than the current
     Funds.

24
25   33.    The July 25, 1997 Proxy Statement also proposed a change in the Fund's

     "fundamental investment policies and investment restrictions" regarding concentration of
26
     investments.
27

28
     COMPLAINT FOR VIOLATION OF UCL                    - 8 -

     010201-11 393389 v1

1    34.    Previously, the Fund's fundamental investment policies and investment restrictions

2   barred investments of "25% or more of the value of its total assets ... in any industry" (excluding

3   investments in U.S. government, agency, or instrumentality securities):

4           Each Fund may not:

5           Purchase securities (other than securities issued or guaranteed by the
            U.S. Government, its agencies or instrumentalities) if, as a result of
6           such purchase, 25% or more of the value of its total assets would be
            invested in any industry. Securities issued by governments or
7           political subdivisions or authorities of governments are not
            considered to be securities subject to this industry concentration
8           restriction.

9    35.    The proposed change incorporated the definition of "concentration" under the

10   Investment Company Act of 1940, and gave the Fund discretion to concentrate investments of

11   greater than 25% of total assets in any industry if necessary to track the Lehman Index:

12          Each Fund may not concentrate investments in a particular industry
            or group of industries, or within one state (except with respect to the
13          Total Bond Market Index Fund and the Short Term Bond Market
            Index Fund, to the extent that the index which each Fund seeks to
14          track is also so concentrated) as concentration is defined under the
            Investment Company Act of 1940 or the rules or regulations
15          thereunder, as such statute, rules or regulations may be amended
            from time to time.

16

17   36.    The rationale of the proposed change, according to the Proxy Statement, was to

18   incorporate the SEC's interpretation of the term "concentration" from the Investment Company Act

19   of 1940 (which at the time was and remains 25%) to give the Fund greater flexibility in the event

     of future changes in interpretation:
20
            The current self-designated restriction specifically limits a Fund's
21          investments to less than 25% of a Fund's total assets in a particular
            industry. Under the Proposal, this current self-designated restriction
22          will be eliminated and replaced by a more flexible proposed
            restriction. The proposed restriction would continue to prevent each
23          Fund from "concentrating" its investments in a single industry or in a
            state, except if the Index that the Fund tracks is "concentrated" in a
24          particular industry or state. Further, to provide flexibility, the
            concept of "concentration" in a Fund's proposed restriction is
25          articulated so as to always track the current meaning of
            "concentration" under the 1940 Act.
26
            At present, "concentration" is interpreted under the 1940 Act in a
27          manner consistent with each Fund's current self-designated
            restriction (25% or more). However, in order to achieve greater
28          flexibility (if for instance the percentage limitation were to be

COMPLAINT FOR VIOLATION OF UCL                    - 9 -

1    changed by the SEC), the proposed restriction would eliminate the
     specific percentage reference and instead define the term
2    "concentration" with respect to the meaning conferred under the
     1940 Act. Because the present interpretation of the percentage limit
3    of "concentration" under the 1940 Act is the same as the current
     concentration restriction, it is not expected that there would be any
4    immediate impact on a Fund's operations as a result of approving
     this aspect of the proposed concentration restriction. Any future
5    change in operations would occur only if the SEC staff changed its
     interpretation of what constitutes "concentration."

6         37.    There has been no subsequent change in the SEC's interpretation of what constitutes

7    "concentration."

8         38.    On September 25, 1997, Schwab Investments reported that the shareholders of the

9    Schwab Government Fund had approved the amendment to the Fund's "fundamental investment

10   objective ... to allow [the] Fund to pursue an indexing strategy":

11            As a result of the amendment referenced in Item No. 1 above, as of
12            November 1, 1997, the name of the Schwab Short/Intermediate
              Government Bond Fund will be changed to the Schwab Short-Term
13            Bond Market Index Fund, and the name of the Schwab Long-Term
              Government Bond Fund will be changed to the Schwab Total Bond
14            Market Index Fund. As a result of the shareholder vote, each Fund's
              fundamental investment objective is amended to allow each Fund to
15            pursue an indexing strategy. The Schwab Short-Term Bond Market
              Index Fund will seek to track the Lehman Brothers Short (1-5)
16            Government/Corporate Index and the Schwab Total Bond Market
              Index Fund will seek to track the Lehman Brothers Aggregate Bond
17            Index. Each index is market-weighted and designed to track the
              performance of broad segments of the bond market.

18        39.    Schwab Investments further reported that shareholders approved the change in the

19   Fund's fundamental investment policies and restrictions with respect to the concentration of

20   investments.

21        40.    The Registration Statement and Prospectus dated January 15, 1998, for the Total

22   Bond Fund and the Schwab Short-Term Total Bond Market Index Fund (at page 10), issued after

23   the 1997 shareholder vote, reiterated the Fund's investment objective to track a bond index:

24            INVESTMENT OBJECTIVES:

25            Each Fund's investment objective is to attempt to provide a high
26            level of current income consistent with preservation of capital *by*
              *seeking to track the investment results of a particular bond index*
27            *through the use of an indexing strategy*.

28
     COMPLAINT FOR VIOLATION OF UCL                      - 10 -

     010201-11 393389 v1

1    Each Fund's investment objective is fundamental, which means that
     it may be changed only by vote of a majority of a Fund's
2    shareholders. [Emphasis added.]

3    41.    The Prospectus further stated (at 10) that the Lehman Brothers Aggregate Bond

4    Index was the index against which the Total Bond Fund would be tracked:

5          THE INDEXES are the Lehman Brothers Mutual Fund Short (1-5)

6          Government/Corporate Index (the Short-Term Index) for the Short
           Bond Fund and the Lehman Brothers Aggregate Bond Index (the
7          Aggregate Bond Index) for the Total Bond Fund.

8    42.    That same recitation of the Fund's investment objective was contained in

9    subsequent Prospectuses for the Fund, as well as in Statements of Additional Information

10   incorporated by reference into the Prospectuses. A Statement of Additional Information (or "SAI")

11   contains a more comprehensive discussion of material facts than is contained in a Prospectus.

12   43.    The Fund's conversion to an indexing strategy was a success, as net assets increased

13   from $24 million as of August 31, 1997, to $1.5 billion as of August 31, 2007.

14   44.    Schwab Investments, in the August 31, 1998 Reports to shareholders, emphasized

15   the conservative nature of the Fund's indexed securities:

16         Schwab's Bond Index Funds seek to track the total returns of broadly
           diversified bond indices. And because index funds generally result
17         in lower portfolio turnover and fewer transactions – and therefore
           lower trading costs – you could potentially realize higher returns.
18
           In addition to some of the same benefits of equity index funds,
19         including broad diversification, lower expenses, consistent
           investment style and straightforward choices, bond index funds can
20         also provide the added benefit of high credit-quality investments.
           Schwab's Bond Index Funds are designed to maintain high credit-
21         quality standards because the indices they seek to track primarily
           comprise U.S. Treasuries, government agency securities and
22         government agency mortgage-backed securities; the remaining bonds
           in the indices are investment-grade corporate bonds rated AAA
23         through BBB the four highest credit ratings. [Emphasis added.]

24   45.    The government agency mortgage-backed securities referenced in the Fund's SEC

25   documents and included in the Lehman Index were issued by the Governmental National Mortgage

26   Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae") and the

27   Federal Home Loan Mortgage Corporation ("Freddie Mac"). Ginnie Mae, Fannie Mae, and

28

COMPLAINT FOR VIOLATION OF UCL            - 11 -

010201-11 393389 v1

1   Freddie Mac are U.S. Government agencies (also known as Government Sponsored Enterprises

2   ("GSEs")) established by Congress to facilitate residential mortgage loans.

3       46.     The GSEs purchased and securitized mortgage loans that met established criteria for

4   creditworthiness.

5       47.     The government agency mortgage-backed securities referenced in the 1998 Annual

6   Report as contained in the Index were fixed income pass-through securities, in which all principal

7   and interest on the underlying mortgages is passed through to the mortgage-backed securities

8   investor.

9       48.     The type of securities that could be acquired by those agencies are restricted by their

10  government charters.

11      49.     Ginnie Mae benefits from an express U.S. Government guarantee of payment on its

12  securities. Both Fannie Mae and Freddie Mac benefit from an implied U.S. Government guarantee

13  of payment on its securities by virtue of their status as U.S. chartered institutions.

14      50.     The mortgage-backed securities issued by Ginnie Mae, Fannie Mae and Freddie

15  Mac, and maintained in the Lehman Index, had the highest credit quality among mortgage-backed

16  securities.

17      51.     The Statement of Additional Information dated May 6, 2002, reported that the Fund

18  had changed its name to the Schwab Total Bond Market Fund:

19          Prior to May 6, 2002, . . . Schwab Total Bond Market Fund was
            named Schwab Total Bond Market Index Fund.

20      52.     The May 6, 2002 Statement of Additional Information, incorporated by reference

21  into the May 6, 2002 Prospectus, continued to state that the Fund's investment objective was

22  unchanged and could only be changed by a majority shareholder vote, which had not occurred:

23          Each fund's investment objective is to attempt to provide a high level
24          of current income consistent with preservation of capital by seeking
            to track the investment results of a particular bond index through the
25          use of an indexing strategy.

26                              * * *

27          The indexes are the Lehman Brothers Mutual Fund Short (1-5 Year)
            U.S. Government/Credit Index for the Schwab Short-Term Bond
28          Market Fund (the Short-Term Index), and the Lehman Brothers U.S.

COMPLAINT FOR VIOLATION OF UCL              - 12 -

1    Aggregate Bond Index for the Schwab Total Bond Market Fund (the
     U.S. Aggregate Bond Index).

2
                                    * * *
3

4    The U.S. Aggregate Bond Index is a market-capitalization weighted
     index of investment-grade debt securities with maturities of greater
     than one year.
5
                                    * * *
6

7    Each fund's investment objective may be changed by vote of a
     majority of its outstanding voting shares.

8    **C.    The Fund Continually Promised to Track the U.S. Aggregate Bond Index**

9         53.    Beginning with a Prospectus dated November 15, 2003, and in subsequent

10   Prospectuses issued by Schwab Investments with respect to the Fund, including the Prospectuses

11   dated November 15, 2004 (as amended September 15, 2005), November 15, 2005, November 15,

12   2006, November 15, 2006 (as amended July 13, 2007), November 15, 2007, and November 15,

13   2007 (as amended June 13, 2008), defendants prominently reported in large type-face at the front

14   of the Prospectuses the following:

15            **The fund seeks high current income by tracking the performance
             of the Lehman Brothers U.S. Aggregate Bond Index.**
16
                              *       *       *
17

18            **To pursue its goal, the fund primarily invests in a diversified
             portfolio of debt instruments that is designed to track the
             performance of the Lehman Brothers U.S. Aggregate Bond
19            Index.**

20        54.    The Statement of Additional Information attached to the November 15, 2003

21   Prospectus – and all subsequent Statements of Additional Information – reaffirmed that the Fund

22   would continue to track the Index until that investment objective was changed by shareholder vote:

23            Each fund's investment objective is to attempt to provide a high level
             of current income consistent with preservation of capital by seeking
24            to track the investment results of a particular bond index through the
             use of an indexing strategy.
25
             The indices are the Lehman Brothers Mutual Fund Short (1-5 Year)
26            U.S. Government/Credit Index (the Short-Term Index) for the
             Schwab Short-Term Bond Market Fund, and the Lehman Brothers
27            U.S. Aggregate Bond Index (the U.S. Aggregate Bond Index) for the
             Schwab Total Bond Market Fund.
28
     COMPLAINT FOR VIOLATION OF UCL                    - 13 -

     010201-11 393389 v1

The Short-Term Index is a market-capitalization weighted index of investment-grade debt securities with maturities between one and five years. The U.S. Aggregate Bond Index is a market-capitalization weighted index of investment-grade debt securities of greater than one year.

\* \* \*

***Each fund's investment objective may be changed by vote of a majority of its outstanding voting shares.*** [Emphasis added.]

**D.    The Fund Substantially Deviated from Its Stated Investment Objective**

55.    By May 31, 2007, the Fund deviated from its fundamental objective of tracking the investments of the Index and of investing primarily in a diversified portfolio of debt instruments to track the performance of the Index. On that date, 32% of the Fund's net assets were invested in non-agency CMOs, as reflected in the following table:

| Nov. 30, 2006 | Feb. 28, 2007 | May 31, 2007 | Nov. 30, 2007 | Feb. 29, 2008 | May 31, 2008 |
|---|---|---|---|---|---|
| 17.40% | 17.70% | 32.00% | 30.00% | 27.30% | 13.20% |

56.    The Fund had no business investing in non-agency CMOs, which were not included in the Index, let alone in the large concentrations that resulted. The mortgage-backed securities included in the Index are limited to "agency fixed-rate and hybrid ARM pass-throughs," and the Index did not include non-agency mortgage-backed issues.

57.    Moreover, the Fund's non-agency CMO investments pushed the Fund's total concentrations in residential mortgage-backed securities – both agency and non-agency – far beyond the residential mortgage-backed securities concentrations reflected in the Index. In 2007, the Index was comprised of 38.6% residential mortgage-backed securities. In 2008, this number increased slightly to 39.6%. In contrast, the Fund's residential mortgage-backed securities investments in 2007 would by May 31, 2007 exceed *67%* of net assets as reflected in the following table:

| Nov. 30, 2006 | Feb. 28, 2007 | May 31, 2007 | Nov. 30, 2007 | Feb. 29, 2008 | May 31, 2008 |
|---|---|---|---|---|---|
| 43.80% | 45.10% | 67.10% | 52.30% | 45.40% | 43.30% |

1    58.    Subsequent analyses of other bond index funds that represent that they track the

2    Index indicates that as of February 29, 2008, the Lehman Government Index had a 0% weighting in

3    non-agency mortgage-backed securities, and a 37% weighting in agency mortgage-backed

4    securities.

5    59.    Thus, the Fund was converted from a diversified fund that would seek to track the

6    Index into a concentrated real estate bond fund. In other words, defendants changed the investment

7    objective of the Fund, which was a fundamental policy, without holding the required shareholder

8    vote.

9    60.    Nonetheless, the Fund largely tracked the Index until August 31, 2007. From

10   August 31, 1997, through August 31, 2007, the Fund substantially performed in a manner that was

11   consistent with the Index, returning an annualized rate of 5.75% compared to 6.04% for the Index –

12   within the 10% deviation anticipated by the Investment Manager.

13   61.    As stated in the Fund's annual and semi-annual reports, this degree of deviation

14   between the Fund and the Index occurred "mainly because, unlike the Index, the Fund incurs

15   operating expenses and trading costs and must keep a small part of its assets in cash for paying

16   expenses and processing shareholder orders."

17   62.    As discussed more below, the Fund would substantially deviate from the Index

18   beginning in the Fall of 2007 and sustain large losses as a result of the Fund's concentrations in

19   non-agency CMOs.

20   E.    **Defendants Failed to Tell Investors that the Fund Had Substantially Deviated From
          Its Stated Investment Objective**

21

22   63.    Not only did defendants fail to hold the required shareholder vote before changing

     the Fund's investment objective, they also failed to give investors notice that they had changed the
23
     Fund's investment objective.
24
25   64.    The Fund first reported a material deviation from the Index in its Semi-Annual

     Report for the period ended February 29, 2008:
26
              The Schwab Total Bond Market Fund returned 3.41%
27            underperforming Lehman Brothers U.S. Aggregate Bond Index,
              which was up 5.67%. Risk aversion and forced selling in the fixed
28            income market, combined with persistent volatility, impacted the

     COMPLAINT FOR VIOLATION OF UCL                - 15 -

     010201-11 393389 v1

1

2

3

4

5

6

7

8

9

fund as investors remained cautious of all non-Government securities irrespective of underlying credit quality. Under these conditions of extreme volatility, U.S. Treasuries outperformed all other fixed income securities.

During the period, the financial markets experienced liquidity and confidence issues as the collapse of the subprime mortgage market and related credit turmoil cascaded into other sectors. Correspondingly, a repricing of risk premiums and a flight to quality across all segments of the fixed income market contributed to downward pricing pressure, with prices for many non-U.S. Treasury securities falling regardless of their quality or fundamentals. In order to maintain liquidity, many investors were forced to sell high quality assets at depressed prices. This selling pressure occurred at the same time demand for non-U.S. Treasury securities was weakest, and as a result prices were driven down even further.

10

11

65.     This Report did not inform investors that the deviation in the Fund's performance was due to the Fund's concentrated play in non-agency CMOs.

66.     Nor did defendants inform investors that the Fund would continue to deviate from

12

13

14

15

16

17

18

19

20

the Index. Among other things, the Prospectus dated September 15, 2007, had stated that "the Fund primarily invests in a diversified portfolio of debt investments that is designed to track the performance of the Lehman Brothers U.S. Aggregate Bond Index" and that "[y]our investment follows the bond market, as measured by the index. The fund is designed to follow the performance of the index during upturns as well as downturns." The November 15, 2007 Statement of Additional Information also reiterated that the Fund's "investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investments results of [the Index] through the use of an indexing strategy."

21

22

23

67.     The Trust had informed investors in the 1997 Proxy Statement (at 23) that some volatility in the Fund against the Index may not be totally avoidable, and that "if a tracking error develops, each Fund is rebalanced to help bring it in line with the Index."

24

25

68.     The Fund had also consistently tracked the Index for the prior decade since inception.

26

27

69.     Accordingly, it was not apparent to investors at that time, who thought they were holding a conservative index fund, that defendants had engaged in a risky strategy of concentrating

28

COMPLAINT FOR VIOLATION OF UCL                    - 16 -

1   the Fund's portfolio in non-agency CMOs that deviated materially from the government and

2   government agency securities that comprised a majority of the Index.

3       70.    Further, from 2002 until June 2008, Kimon Daifotis acted as the senior vice

4   president and chief investment officer of the Investment Advisor, responsible for the overall

5   management of the Fund. On June 13, 2008, the Trust filed a Supplement to the Fund's Prospectus

6   dated November 15, 2007, stating that Jeffrey Mortimer was then responsible for the overall

7   management of the Fund. No explanation was given by defendants, in the Prospectus or elsewhere,

8   for replacing Daifotis as Fund manager. Investors were not informed that Daifotis had engaged in

9   an investment strategy that was inconsistent with the Fund's stated investment objectives and

10   policies. Investors were also not informed that Daifotis was in fact asked to resign.

11       71.    The Fund's underperformance against the Index did continue subsequent to

12   February 29, 2008. *From August 31, 2007, through February 27, 2009, the Fund experienced a*

13   *negative total return of 4.80% compared to a positive 7.85% total return for the Index – a total*

14   *underperformance of 12.64% in absolute terms (including interest payments) and representing*

15   *over $100 million in lost value.*

16       72.    The following chart, prepared on a Bloomberg terminal and comparing the Fund's

17   change in total return to the Lehman Index's change in total return over the period December 31,

18   2004, through February 27, 2009, demonstrates how closely correlated the Fund was to the Index

19   until approximately August 31, 2007, and how dramatically the Fund deviated from the Index

20   thereafter:

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF UCL        - 17 -

010201-11 393389 v1

73.     The magnitude of under-performance between the Fund and the Index was not the result of unforeseen economic circumstances, but rather due to the gross deviation by defendants from the Fund's stated investment objective.

## F.     The Performance Deviation and Consequent Damage Was Caused by the Fund's Concentrated Non-Agency CMO Investments

74.     The Fund's deviation in performance from the Index was caused by the Fund's concentrated investments in non-agency CMOs.

75.     The CMOs in the Fund's portfolio were not issued by government agencies.  Rather, they were issued by financial institutions through subsidiaries and backed by residential loans that did not conform to the agencies' higher loan underwriting requirements.

76.     Moreover, non-agency CMOs purchased for the Fund represented tranches of mortgage-backed securities, such as principal only or interest only payments, and were significantly more risky than the agency-issued mortgage-backed securities that were part of the Index.  Included in the Fund's portfolio were CMOs sponsored by such subprime lenders as Citigroup, Merrill Lynch, Countrywide, Bear Stearns, IndyBank, Lehman, and Washington Mutual.

77. The Fund's concentrated investments in CMOs were made at a time when there was increased concern with the quality of mortgage lending. For example, on June 28, 2007, the Department of Treasury, Federal Reserve System, Federal Deposit Insurance Corp., and National Credit Union Administration, issued a joint Statement on Subprime Mortgage Lending "to address subprime mortgage products and lending practices."

78. The riskier non-agency CMO investments caused the Fund's NAV to drop throughout most of 2008 as reflected in the following chart:



**G. Defendants Also Violated the Fund's No-Concentration Policy**

79. As noted, the Fund's SAIs prohibited the Fund from concentrating more than 25% of its assets in any one industry (except as required by the Index). This was a fundamental policy that could not be changed without a shareholder vote.

80. Until September 1, 2006, the Fund's SAIs considered non-agency CMOs to constitute a single "industry" subject to the concentration limit:

> Based on the characteristics of mortgage-backed securities, each fund has identified mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities as a separate industry for purposes of a fund's concentration policy.

81. Then, by fiat and without holding a shareholder vote, the SAI amended

September 1, 2006, indicated that the Fund *reversed* its conclusion that mortgage-backed securities

comprised "a particular industry" and revised the description of "concentration":

> The funds have determined that mortgage-backed securities issued by
> private lenders do not have risk characteristics that are correlated to
> any industry and, therefore, the funds have determined that
> mortgage-backed securities issued by private lenders are not part of
> any industry for purposes of the funds' concentration policies. This
> means that a fund may invest more than 25% of its total assets in
> privately-issued mortgage-backed securities, which may cause the
> fund to be more sensitive to adverse economic, business or political
> developments that affect privately-issued mortgage-backed
> securities. Such developments may include changes in interest rates,
> state or federal legislation affecting residential mortgages and their
> issuers, and changes in the overall economy.

82. With respect to another Schwab fund that shared the *same* SAI as the Schwab Total

Bond Market Fund, the Honorable William Aslup of this Court has ruled, notwithstanding

defendants' effort to change the definition in this manner, that the prior concentration policy must

be honored and that the limit may be exceeded only after a shareholder vote. *In re Charles Schwab

Corp. Sec. Litig.*, Order Re: 1940 Act Summary Judgment Motions, Cause No. C-08-01510 WHA

(Mar. 30, 2010).

83. The Fund's non-agency CMO concentrations above 25% of net assets violated the

Fund's stated investment objectives that the Fund's assets not be concentrated more than 25% in

any one industry (except as required by the Index).

## V. CLASS ACTION ALLEGATIONS

84. Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3), individually and on behalf of a class consisting of all person or entities

who owned shares of the Fund as of May 31, 2007. Excluded from the Class are the defendants

herein, any subsidiaries or affiliates of the defendants in which defendants or its affiliates have a

controlling ownership interest, officers and directors of any of the defendants, heirs, successors and

assigns of any of the defendants or their officers and directors, and any entity in which any

defendant has a controlling ownership interest.

1       85.     The members of the Class are so numerous that joinder of all members is

2   impracticable. While the exact number of members of the Class is unknown to Plaintiff at this time

3   and can only be ascertained through appropriate discovery, Plaintiff believes that there are tens-of-

4   thousands of members of the proposed Class if not more given that the Fund had over $1.3 billion

5   in assets as of January 1, 2007. Record owners and other members of the Class may be identified

6   from records maintained by the Registrant or its transfer agent and may be notified of the pendency

7   of this action by mail.

8       86.     Plaintiff's claims are typical of the claims of the members of the Class as all

9   members of the Class are similarly affected by defendants' wrongful conduct in violation of the

10  California Unfair Competition Law.

11      87.     Plaintiff will fairly and adequately protect the interests of the members of the Class

12  and has retained counsel competent and experienced in class litigation.

13      88.     Common questions of law and fact exist as to all members of the Class and

14  predominate over any questions solely affecting individual members of the Class. Among the

15  questions of law and fact common to the Class are:

16      (a)     Whether the Trust or Investment Advisor caused the Fund to deviate from an

17  investment objective or policy that could only be changed by a shareholder vote;

18      (b)     Whether the Trust or Investment Advisor concentrated investments in the

19  Fund of in excess of 25% of its total assets in any one industry;

20      (c)     Whether non-agency mortgage-backed securities comprise one or more than

21  one industry.

22      (d)     Whether agency and non-agency mortgage-backed securities comprise one

23  or more than one industry.

24      (e)     Whether the Trust's acts as alleged herein violated the ICA;

25      (f)     Whether the UCL applies;

26      (g)     Whether the Investment Advisor caused the Fund to violate the ICA and

27  § 17200; and

28      (h)     Whether the members of the Class are entitled to restitution.

COMPLAINT FOR VIOLATION OF UCL     - 21 -

010201-11 393389 v1

1       89.    A class action is superior to all other available methods for the fair and efficient

2    adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

3    damages suffered by any individual Class member may be relatively small, the expense and burden

4    of individual litigation make it impossible for members of the Class to redress individually the

5    wrongs done to them. There will be no difficulty in managing this action as a class action.

6                   **VI.    APPLICATION OF CALIFORNIA LAW**

7       90.    Plaintiff and the members of the Class signed account agreements with Schwab

8    stipulating that California law would apply to any disputes that arise thereunder.

9       91.    In addition, defendants' efforts to deviate from the Fund's fundamental policies

10   without first obtaining shareholder approval was devised, approved, implemented, and managed

11   from defendants' headquarters in San Francisco, California.

12      92.    Therefore, California law applies to the claims of Plaintiff and all Class members.

13                                **COUNT:**

14     **VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE §§ 17200, ET SEQ.**

15      93.    Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs

16   as if fully set forth herein.

17      94.    Defendants' conduct, as described above, deviated from the Fund's "fundamental"

18   investment policies that were changeable only by a shareholder vote that was not held in that, as

19   detailed above:

20           (a)    Defendants permitted the Fund to deviate from its fundamental investment

21           objective of investing in bond securities that tracked the Lehman Brothers U.S. Aggregate

22           Bond Index; and

23           (b)    Defendants permitted the Fund to deviate from its fundamental no-

24           concentration policy precluding investment of more than 25% of the Fund's total assets in

25           non-agency mortgage-backed securities.

26      95.    The foregoing deviations constitue a violation of § 13(a) of the Investment

27   Company Act, 15 U.S.C. § 80a-13(a) and, as such, a violation of California Business & Professions

28   Code §§ 17200, *et seq.*

COMPLAINT FOR VIOLATION OF UCL          - 22 -

010201-11 393389 v1

1    96.    The above-noted investments made in violation of stated fundamental investment

2  policies caused significant losses to the Fund's shareholders, as alleged above. As described

3  above, Plaintiff and other members of the Class have suffered substantial damages in connection

4  with losses in the Funds' value that resulted from the Funds' deviation from its stated fundamental

5  investment policies.

6    97.    All of the wrongful conduct alleged herein occurred and continues to occur in the

7  conduct of these defendants' businesses. These defendants' wrongful conduct is part of a pattern

8  or generalized course of conduct that has been repeated in the State of California and beyond on a

9  continuing basis. The defendants' conduct thus impacts the public interest.

10    98.    As a proximate result of the defendants' wrongful conduct, Plaintiff sustained

11  money damages in connection with losses in the Fund's value that resulted from the Fund's

12  deviation from its stated fundamental investment policies.

13    99.    Plaintiff requests that this Court enter such orders and judgments as may be

14  necessary to restore to any person in interest any money that may have been acquired by means of

15  such unfair competition, as provided in California Business & Professions Code §§ 17203 and

16  Civil Code § 3345, and for such relief as set forth in the Prayer for Relief.

17                **PRAYER FOR RELIEF**

18    WHEREFORE, Plaintiff prays for relief and judgment, as follows:

19    A.    Determining that this action is a proper class action and certifying Plaintiff as a

20             representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

21    B.    Awarding restitution in favor of Plaintiff and the members of the Class against all

22             defendants, jointly and severally;

23    C.    Disgorging from defendants for the benefit of the Class any management or other

24             fees forfeited by defendants' deviation from the Fund's fundamental investment

25             objectives;

26    D.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this

27             action, including counsel fees and expert fees; and

28    E.    Such equitable, injunctive or other relief as deemed appropriate by the Court.

1

2 Dated: September 3, 2010.

3 HAGENS BERMAN SOBOL SHAPIRO LLP

4

5 By _____
6 REED R. KATHREIN (139304)

7 Peter E. Borkon (212596)
715 Hearst Avenue, Suite 202
8 Berkeley, CA 94710
Telephone: (510) 725-3000
9 Facsimile: (510) 725-3001
reed@hbsslaw.com
10 peterb@hbsslaw.com

11 Steve W. Berman
Sean R. Matt
12 HAGENS BERMAN SOBOL SHAPIRO
1918 Eighth Avenue, Suite 3300
13 Seattle, Washington 98101
Telephone: (206) 623-7929
14 Facsimile: (206) 623-0594
steve@hbsslaw.com
15 sean@hbsslaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF UCL                    - 24 -

010201-11 393389 v1