1  Reed R. Kathrein (139304)
   Peter E. Borkon (212596)
2  HAGENS BERMAN SOBOL SHAPIRO LLP
   715 Hearst Avenue, Suite 202
3  Berkeley, CA 94710
   Telephone:  (510) 725-3000
4  Facsimile:  (510) 725-3001
   reed@hbsslaw.com
5  peterb@hbsslaw.com

6  Steve W. Berman (*pro hac vice*)
   Sean R. Matt (*pro hac vice*)
7  HAGENS BERMAN SOBOL SHAPIRO LLP
   1918 Eighth Avenue, Suite 3300
8  Seattle, WA  98101
   Telephone: (206) 623-7292
9  Facsimile:  (206) 623-0594
   steve@hbsslaw.com
10 sean@hbsslaw.com

11

12                    **UNITED STATES DISTRICT COURT**
                    **NORTHERN DISTRICT OF CALIFORNIA**
13

14 JERRY SMIT, individually and on behalf of all          Case No. 10-CV-03971-LHK
   others similarly situated,
15                                                          CORRECTED FIRST AMENDED
                                          Plaintiff,        COMPLAINT FOR VIOLATION OF
                                                            CALIFORNIA BUS. & PROF. CODE
16         v.                                               § 17200

17 CHARLES SCHWAB & CO., INC., SCHWAB                       Date Action Filed:  September 3, 2010
   INVESTMENTS and CHARLES SCHWAB
18 INVESTMENT MANAGEMENT, INC.,

19                                        Defendants.

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF UCL

010201-11  412027 v1

Plaintiff, for her First Amended Class Action Complaint, alleges the following upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, based upon the investigation made by her attorneys, which included, *inter alia*, a review of Securities and Exchange Commission ("SEC") filings, news reports and other publicly available materials.

## I.     NATURE OF THE ACTION

1.     Plaintiff brings this action against members of the Charles Schwab financial services family on behalf of persons who owned shares of the Schwab Total Bond Market Fund (the "Fund") (Ticker:  SWLBX) on May 31, 2007.

2.     The action is brought against defendants for causing the Fund to deviate from its fundamental investment objective to track the Lehman Brothers U.S. Aggregate Bond Index (the "Index") (Ticker:  LBUSTRUU).  Section 8 of the Investment Company Act of 1940 (the "ICA") directs an investment company to recite in its Registration Statement its "policy … in respect of … concentrating investments in a particular industry or group of industries"; "all investment policies of the registrant … which are changeable only if authorized by shareholder vote"; as well as all policies that "the registrant deems matters of fundamental policy."  15 U.S.C. § 80a-8(b)(1), (2) & (3).  Section 13 prohibits a registered investment company from deviating from any such policies "unless authorized by the vote of a majority of its outstanding voting securities."  15 U.S.C. § 80a-13.  By violating Section 13, defendants committed a per se violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* (the "UCL").

3.     The Fund deviated from its fundamental investment policy by investing a material and substantial percentage of its portfolio in residential mortgage-backed securities, including high risk non-agency collateralized mortgage obligations ("CMOs").  The non-agency CMOs were not part of the Index and were substantially more risky than the U.S. agency securities and other instruments that comprised the Index.

4.     The Fund also deviated from its stated concentration policy by investing more than 25% of its total assets in non-agency mortgage-backed securities and CMOs.  The Fund's policy

1  prohibited concentration of investments greater than 25% in any industry (other than if necessary to

2  track the Index).

3       5.     The Fund's deviation from its fundamental policies exposed the Fund and its

4  shareholders to tens of millions of dollars in losses stemming from a sustained decline in the value

5  of non-agency mortgage-backed securities.  The Fund's deviations caused investors to suffer a

6  negative 12.64% differential in total return for the Fund compared to the Index for the period

7  August 31, 2007, through February 27, 2009, consisting of a negative total return of 4.80% for the

8  Fund compared to a positive total return of 7.85% for the Index over that same period (including

9  interest payments).

## II.     JURISDICTION AND VENUE

11       6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

12  §§ 1332(d)(2), and 1367.  The plaintiff is diverse from at least one of the defendants and the

13  amount in controversy exceeds $5 million.

14       7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts

15  giving rise to the violations of law complained of herein, including the dissemination to

16  shareholders of the Registration Statements, Proxy Statements, and Prospectuses, referenced herein

17  occurred in this District.

18       8.     Intradistrict Assignment:  Assignment to the San Francisco or Oakland division of

19  this Court is appropriate because Defendants' headquarters and principal place of business is in San

20  Francisco, California.  Because this action arises in the county of San Francisco, pursuant to

21  Northern District of California, Local Rule 3-2(d), assignment to the San Francisco or Oakland

22  Division is proper.

## III.     PARTIES

24       9.     Plaintiff Jerry Smit is a resident of Arvada, Colorado.  Beginning in October 1998

25  and continuing through July 2010, Ms. Smit purchased shares of the Schwab Total Bond Market

26  Fund, through both regular share purchases and reinvestment of dividends.  Ms. Smit presently

27  holds approximately 546.07 shares of the Fund.  Ms. Smit suffered injury as a result of defendants'

28  violations of the California Unfair Competition Law.

10.     Defendant Schwab Investments ("Issuer," "Trust" or "Registrant") is a registered investment company and has its headquarters at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Investments was organized under Massachusetts law on October 26, 1990, and is a Massachusetts Business Trust.  It is the Registrant for the Total Bond Market Fund, the issuer of Fund shares, and performed trust services for the Fund.  The Total Bond Market Fund is a series of the Trust.

11.     Defendant Charles Schwab & Co., Inc. ("Schwab" or "Underwriter") is also headquartered at 101 Montgomery Street, San Francisco, CA 94104.  Schwab is the parent company of Schwab Investments.  Pursuant to a Distribution Agreement, Schwab was, during the relevant time period, the principal underwriter and distributor for shares of the Fund and was the Trust's agent for the purpose of the continuous offering of the Fund's shares.

12.     Defendant Charles Schwab Investment Management, Inc., also known as Charles Schwab Investment Management Services ("CSIM" or the "Investment Advisor"), also is headquartered at 101 Montgomery Street, San Francisco, CA 94104.  Schwab Management is the asset management arm of The Charles Schwab Corporation, with over $200 billion in assets under management.  Schwab Management oversees the asset management and administration of the Total Bond Market Fund.  As compensation for these services, Schwab Management receives a management fee from the Fund.

13.     Schwab, CSIM, and the Trust are under the common control of The Charles Schwab Corp., a publicly traded corporation.

14.     The following diagram depicts the relationship between the foregoing entities and the Fund:

15.     Schwab and CSIM directly or indirectly control the Trust and the Fund, both individually and collectively.  Each of these Defendants controlled the Trust and the Fund and each was a culpable participant in the misconduct alleged herein.

## IV.     SUBSTANTIVE ALLEGATIONS

**A.     Background and History Before the 1997 Shareholder Vote**

16.     The Schwab Total Bond Market Fund (SWLBX) was initiated on March 5, 1993, under a predecessor name – the Schwab Long-Term Government Bond Fund (the "Government Bond Fund") – as an actively managed bond fund.

17.     According to the Prospectus for the Government Bond Fund dated December 30, 1994, as amended June 30, 1995, the investment objective of the Government Bond Fund was "to provide a high level of current income consistent with preservation of capital by investing primarily in securities issued or guaranteed by the United States Government, its agencies or instrumentalities and repurchase agreements covering those securities."

18.     The June 30, 1995 Prospectus also stated that "[the] Fund's investment objective …
is fundamental and cannot be changed without approval by holders of a majority of the Fund's
outstanding voting shares."

19.     The Prospectus added that "U.S. Government Securities are generally viewed by the
Investment Manager as being among the safest of debt securities with respect to the timely
payment of principal and interest …."

20.     Schwab was unable to successfully market the Government Bond Fund.

21.     As of August 31, 1997, after more than four years of operations, the Government
Bond Fund only had $24.8 million in investment assets.

**B.      The Formation of the Schwab Total Bond Market Index Fund**

22.     On July 25, 1997, Schwab Investments mailed to investors in the Government Bond
Fund a Proxy Statement on SEC Form 14A with respect to a shareholder vote "[t]o amend [the]
Fund's fundamental investment objective resulting in changing the Fund from [a] Government
bond fund[] to [a] bond index fund[] that would include Government and other fixed income
securities" (at 2).

23.     The Proxy Statement (at 14) informed investors that the Board of Trustees of the
Fund was proposing to change the Fund's then existing investment objective from attempting "to
provide a high level of current income consistent with preservation of capital by investing
primarily in securities issued or guaranteed by the U.S. Government" to a "proposed investment
objective … to attempt to provide a high level of current income consistent with preservation of
capital by seeking to track the investment results of a particular bond index through the use of an
indexing strategy."

24.     The Proxy Statement added (at 3) that "[i]f its proposed investment objective is
approved, the Total Bond Fund would invest in a portfolio of fixed-income securities that seeks to
track the Lehman Brothers Aggregate Bond Index."

25.     The Lehman Index was described in the Proxy Statement (at 18) as "a broad market-
weighted index which encompasses the following classes of investment grade fixed-income

1   securities:  U.S. Treasury and agency securities, corporate bonds, international (dollar-

2   denominated) bonds, agency mortgage-backed securities, and asset-backed securities."

3        26.     The Lehman Index is a proprietary Lehman Brothers index, consisting of over 9,000

4   separate instruments whose exact composition is not generally available to investors.  The

5   composition of the Index changes from time-to-time.  It is now called the Barclay's U.S. Aggregate

6   Bond Index.

7        27.     The Proxy Statement stated with respect to mortgage-backed securities and asset-

8   backed securities (at 21) that "[t]he primary risk of these securities is 'prepayment risk.'  Namely

9   that during periods of changing interest rates, the payment streams in the underlying pools will be

10  paid faster … than anticipated."

11       28.     The Proxy Statement further described (at 22) the "investment process of indexing"

12  by stating that the Fund "would be unable to hold all of the individual issues which comprise the

13  [Index] because of the large number of securities in the [Index]," but that the "Fund would hold a

14  portfolio of fixed-income securities that is managed to *closely approximate* [the] Index's

15  'characteristics' of coupon rate, duration, sector, quality and optionality (or convexity)":

16          If the proposed investment objective is approved, the Funds would
    not be managed according to traditional methods of "active"
17          investment management, which involve the buying and selling of
    securities based upon economic, financial, and market analyses and
18          investment judgment.  Instead, the Investment Manager would utilize
    a "passive" or "indexing" investment approach, to attempt to track
19          the investment performance of each Fund's Index through statistical
    sampling and other procedures.  The Funds would be unable to hold
20          all of the individual issues which comprise the Indexes because of
    the large number of securities in the Indexes.  Each Fund would hold
21          a portfolio of fixed-income securities that is *managed to closely
    approximate* its Index's "characteristics" of coupon rate, duration,
22          sector, quality and optionality (or convexity).  [Emphasis added.]

23       29.     The Proxy Statement assured investors (at 22) that "[b]efore purchasing or selling a

24  security, the Investment Manager would analyze each security's characteristics and determine

25  whether purchasing or selling the security would help the Fund's portfolio *approximate* the

26  characteristics of the Index":

27          Before purchasing or selling a security, the Investment Manager
    would analyze each security's characteristics and determine whether
28          purchasing or selling the security would help the Fund's portfolio

*approximate the characteristics of the Index. As a result, when the Fund's portfolio as a whole is considered, the Fund's performance and risk is expected to be similar to its Index's performance and risk.*

For example, with respect to the "sector characteristic," if U.S. Treasury and agency securities represent approximately 60% of an Index's interest rate risk, then approximately 60% of the respective Fund's interest rate risk would come from such securities. Similarly, if corporate bonds represent 20% of the Fund's interest rate risk, then they would represent approximately 20% of the Fund's interest rate risk. This technique is expected to enable each Fund to track the coupon income and price movements of its respective Index, while minimizing transaction, custodial and accounting costs. [Emphasis added.]

30. The 1997 Proxy Statement represented (at 23) that the Investment Manager would seek a 90% correlation between the Fund and the Index:

Over the long term, the Investment Manager will seek a correlation between the performance of each Fund, as measured by its net asset value, including the value of its dividend and capital gain distributions, and that of its Index of 0.9 or better. A correlation of 1.0 would indicate perfect correlation, but since each Fund incurs operating expenses, unlike its respective Index, a perfect correlation is unlikely to be achieved. The Investment Manager will monitor the performance of each Fund versus that of its Index on a regular basis. If a tracking error develops, each Fund is rebalanced to help bring it in line with the Index. In the unlikely event that a correlation of 0.9 or better is not achieved, the Board of Trustees of a Fund will consider alternative arrangements.

31. The 1997 Proxy Statement described (at 2) Schwab's rationale for proposing that the Fund be changed to an index fund and the Fund's appeal to passive investors who were seeking "broad bond portfolio diversification" and "a consistent investment style," as follows:

Schwab has long been an advocate of indexing as an investment strategy. The Board of Trustees believes the proposed bond index funds will offer customers many benefits through the use of an indexing strategy. These benefits include: broad bond portfolio diversification, a consistent investment style, and potentially lower trading costs as a result of lower portfolio turnover and fewer transactions, over the long term. And, all other things being equal, lower costs can translate into higher returns.

The objective of an index fund, unlike an actively managed fund, is to closely track the total return of a benchmark or index for a particular market, or market sector. Because both proposed Funds plan to invest in a larger number and broader range of bonds, the Funds should provide investors a more broadly diversified bond fund investment for their asset allocation plan. The proposed bond index funds could represent excellent choices for the core component of an

1      investor's bond fund holdings and could fulfill the bond portion of an

    asset allocation plan, whether that plan calls for a longer-term or

2      short-term bond fund.

3            32.    The 1997 Proxy Statement (at 2) stated that because investors would not be required

4  to actively monitor and assess the investment selections of the Fund's Investment Advisor (which

5  was charged with the responsibility of following the Index), the bond index fund "should give a

6  broader appeal to a larger number of investors."

7      In addition, the Board of Trustees believes that the proposed bond

    index funds should have a broader appeal to a larger number of

8      investors.  This would permit the Funds to be marketed more

    effectively, creating economies of scale if assets grow.  These

9      economies could be achieved by spreading the Funds' fixed costs

    over a larger asset base, which would potentially lower the Funds'

10      operating expenses.

11            33.    The Proxy Statement sought to assure investors (at 4) that the change to an indexing

12  strategy would not then increase the risk profile of the Fund because 80% of the Fund's assets

13  would still be invested on a current basis in U.S. government or agency bonds, and given the then

14  current composition of the Index, 15% of the portfolio would be invested in investment grade

15  corporate bonds, 4% in international (dollar-denominated bonds), and 1% in asset-backed

16  securities:

17      As shown in the two preceding charts, as of June 30, 1997, both of

    the proposed index Funds would maintain significant positions in

18      U.S. Treasury and agency, and agency mortgage-backed securities –

    85.0% for the Short-Term Bond Market Index Fund and 80.0% for

19      the Total Bond Market Index Fund.

20      The non-U.S. Treasury/agency securities represented in both indices

    are all investment grade and quite diversified.  As a result, both index

21      Funds are expected to maintain relatively low levels of credit risk.

    However, given that U.S. Treasury and agency securities have the

22      lowest credit risk compared to other types of fixed income securities,

    the portfolio management team anticipates that the proposed Funds

23      would have a slightly higher level of credit risk than the current

    Funds.

24            34.    The July 25, 1997 Proxy Statement also proposed a change in the Fund's

25  "fundamental investment policies and investment restrictions" regarding concentration of

26  investments.

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF UCL    - 8 -

35.     Previously, the Fund's fundamental investment policies and investment restrictions barred investments of "25% or more of the value of its total assets … in any industry" (excluding investments in U.S. government, agency, or instrumentality securities):

> Each Fund may not:
>
> Purchase securities (other than securities issued or guaranteed by the U.S. Government, its agencies or instrumentalities) if, as a result of such purchase, 25% or more of the value of its total assets would be invested in any industry.  Securities issued by governments or political subdivisions or authorities of governments are not considered to be securities subject to this industry concentration restriction.

36.     The proposed change incorporated the definition of "concentration" under the Investment Company Act of 1940, and gave the Fund discretion to concentrate investments of greater than 25% of total assets in any industry if necessary to track the Lehman Index:

> Each Fund may not concentrate investments in a particular industry or group of industries, or within one state (except with respect to the Total Bond Market Index Fund and the Short Term Bond Market Index Fund, to the extent that the index which each Fund seeks to track is also so concentrated) as concentration is defined under the Investment Company Act of 1940 or the rules or regulations thereunder, as such statute, rules or regulations may be amended from time to time.

37.     The rationale of the proposed change, according to the Proxy Statement, was to incorporate the SEC's interpretation of the term "concentration" from the Investment Company Act of 1940 (which at the time was and remains 25%) to give the Fund greater flexibility in the event of future changes in interpretation:

> The current self-designated restriction specifically limits a Fund's investments to less than 25% of a Fund's total assets in a particular industry.  Under the Proposal, this current self-designated restriction will be eliminated and replaced by a more flexible proposed restriction.  The proposed restriction would continue to prevent each Fund from "concentrating" its investments in a single industry or in a state, except if the Index that the Fund tracks is "concentrated" in a particular industry or state.  Further, to provide flexibility, the concept of "concentration" in a Fund's proposed restriction is articulated so as to always track the current meaning of "concentration" under the 1940 Act.
>
> At present, "concentration" is interpreted under the 1940 Act in a manner consistent with each Fund's current self-designated restriction (25% or more).  However, in order to achieve greater flexibility (if for instance the percentage limitation were to be

changed by the SEC), the proposed restriction would eliminate the specific percentage reference and instead define the term "concentration" with respect to the meaning conferred under the 1940 Act.  Because the present interpretation of the percentage limit of "concentration" under the 1940 Act is the same as the current concentration restriction, it is not expected that there would be any immediate impact on a Fund's operations as a result of approving this aspect of the proposed concentration restriction.  Any future change in operations would occur only if the SEC staff changed its interpretation of what constitutes "concentration."

38.     There has been no subsequent change in the SEC's interpretation of what constitutes "concentration."

39.     On September 25, 1997, Schwab Investments reported that the shareholders of the Schwab Government Fund had approved the amendment to the Fund's "fundamental investment objective … to allow [the] Fund to pursue an indexing strategy":

As a result of the amendment referenced in Item No. 1 above, as of November 1, 1997, the name of the Schwab Short/Intermediate Government Bond Fund will be changed to the Schwab Short-Term Bond Market Index Fund, and the name of the Schwab Long-Term Government Bond Fund will be changed to the Schwab Total Bond Market Index Fund.  As a result of the shareholder vote, each Fund's fundamental investment objective is amended to allow each Fund to pursue an indexing strategy.  The Schwab Short-Term Bond Market Index Fund will seek to track the Lehman Brothers Short (1-5) Government/Corporate Index and the Schwab Total Bond Market Index Fund will seek to track the Lehman Brothers Aggregate Bond Index.  Each index is market-weighted and designed to track the performance of broad segments of the bond market.

40.     Schwab Investments further reported that shareholders approved the change in the Fund's fundamental investment policies and restrictions with respect to the concentration of investments.

41.     The Registration Statement and Prospectus dated January 15, 1998, for the Total Bond Fund and the Schwab Short-Term Total Bond Market Index Fund (at 10), issued after the 1997 shareholder vote, reiterated the Fund's investment objective to track a bond index:

INVESTMENT OBJECTIVES:

Each Fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital *by seeking to track the investment results of a particular bond index through the use of an indexing strategy*.

Each Fund's investment objective is fundamental, which means that it may be changed only by vote of a majority of a Fund's shareholders.  [Emphasis added.]

42.     The Prospectus further stated (at 10) that the Lehman Brothers Aggregate Bond Index was the index against which the Total Bond Fund would be tracked:

THE INDEXES are the Lehman Brothers Mutual Fund Short (1-5)

Government/Corporate Index (the Short-Term Index) for the Short Bond Fund and the Lehman Brothers Aggregate Bond Index (the Aggregate Bond Index) for the Total Bond Fund.

43.     That same recitation of the Fund's investment objective was contained in subsequent Prospectuses for the Fund, as well as in Statements of Additional Information incorporated by reference into the Prospectuses.  A Statement of Additional Information (or "SAI") contains a more comprehensive discussion of material facts than is contained in a Prospectus.

44.     The Fund's conversion to an indexing strategy was a success, as net assets increased from $24 million as of August 31, 1997, to $1.5 billion as of August 31, 2007.

45.     Schwab Investments, in the August 31, 1998 Reports to shareholders, emphasized the conservative nature of the Fund's indexed securities:

Schwab's Bond Index Funds seek to track the total returns of broadly diversified bond indices.  And because index funds generally result in lower portfolio turnover and fewer transactions – and therefore lower trading costs – you could potentially realize higher returns.

In addition to some of the same benefits of equity index funds, including broad diversification, lower expenses, consistent investment style and straightforward choices, bond index funds can also provide the added benefit of high credit-quality investments. Schwab's Bond Index Funds are designed to maintain high credit-quality standards because the indices they seek to track primarily comprise U.S. Treasuries, government agency securities and government agency mortgage-backed securities; the remaining bonds in the indices are investment-grade corporate bonds rated AAA through BBB the four highest credit ratings.

46.     The government agency mortgage-backed securities referenced in the Fund's SEC documents and included in the Lehman Index were issued by the Governmental National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Ginnie Mae, Fannie Mae, and

Freddie Mac are U.S. Government agencies (also known as Government Sponsored Enterprises ("GSEs")) established by Congress to facilitate residential mortgage loans.

47.     The GSEs purchased and securitized mortgage loans that met established criteria for creditworthiness.

48.     The government agency mortgage-backed securities referenced in the 1998 Annual Report as contained in the Index were fixed income pass-through securities, in which all principal and interest on the underlying mortgages is passed through to the mortgage-backed securities investor.

49.     The type of securities that could be acquired by those agencies are restricted by their government charters.

50.     Ginnie Mae benefits from an express U.S. Government guarantee of payment on its securities.  Both Fannie Mae and Freddie Mac benefit from an implied U.S. Government guarantee of payment on its securities by virtue of their status as U.S. chartered institutions.

51.     The mortgage-backed securities issued by Ginnie Mae, Fannie Mae and Freddie Mac, and maintained in the Lehman Index, had the highest credit quality among mortgage-backed securities.

52.     The Statement of Additional Information dated May 6, 2002, reported that the Fund had changed its name to the Schwab Total Bond Market Fund:

> Prior to May 6, 2002,…. Schwab Total Bond Market Fund was named Schwab Total Bond Market Index Fund.

53.     The May 6, 2002 Statement of Additional Information, incorporated by reference into the May 6, 2002 Prospectus, continued to state that the Fund's investment objective was unchanged and could only be changed by a majority shareholder vote, which had not occurred:

> Each fund's investment objective is to attempt to provide a high level of current income consistent with preservation of capital by seeking to track the investment results of a particular bond index through the use of an indexing strategy.
>
> * * *
>
> The indexes are the Lehman Brothers Mutual Fund Short (1-5 Year) U.S. Government/Credit Index for the Schwab Short-Term Bond Market Fund (the Short-Term Index), and the Lehman Brothers U.S.

1

Aggregate Bond Index for the Schwab Total Bond Market Fund (the
U.S. Aggregate Bond Index).

2

* * *

3

4

The U.S. Aggregate Bond Index is a market-capitalization weighted
index of investment-grade debt securities with maturities of greater
than one year.

5

* * *

6

7

Each fund's investment objective may be changed by vote of a
majority of its outstanding voting shares.

8

54.     The Statement of Additional Information attached to the November 15, 2003

9

Prospectus – and all subsequent Statements of Additional Information – repeated the fundamental

10

policy that Fund would continue to track the Index until that investment policy was changed by

11

shareholder vote:

12

Each fund's investment objective is to attempt to provide a high level
of current income consistent with preservation of capital by seeking
to track the investment results of a particular bond index through the
use of an indexing strategy.

13

14

15

The indices are the Lehman Brothers Mutual Fund Short (1-5 Year)
U.S. Government/Credit Index (the Short-Term Index) for the
Schwab Short-Term Bond Market Fund, and the Lehman Brothers
U.S. Aggregate Bond Index (the U.S. Aggregate Bond Index) for the
Schwab Total Bond Market Fund.

16

17

18

The Short-Term Index is a market-capitalization weighted index of
investment-grade debt securities with maturities between one and
five years.  The U.S. Aggregate Bond Index is a market-
capitalization weighted index of investment-grade debt securities of
greater than one year.

19

20

* * *

21

22

*Each fund's investment objective may be changed by vote of a
majority of its outstanding voting shares*.  [Emphasis added.]

23

**C.      The Fund Materially Deviated from Its Fundamental Investment Policy**

24

55.     By or on May 31, 2007, the Fund materially deviated from its fundamental

25

investment policy of tracking the investments of the Index and of investing primarily in a

26

diversified portfolio of debt instruments to track the performance of the Index.  By then, the Fund's

27

total concentrations in residential mortgage-backed securities materially exceeded the residential

28

mortgage-backed securities concentrations reflected in the Index.  In 2007, the Index was

comprised of 38.6% residential mortgage-backed securities.  In 2008, this number increased slightly to 39.6%.  In contrast, the Fund's residential mortgage-backed securities investments would by May 31, 2007 exceed **67%** of net assets as reflected in the following table:

| Nov. 30, 2006 | Feb. 28, 2007 | May 31, 2007 | Nov. 30, 2007 | Feb. 29, 2008 | May. 31, 2008 |
| --- | --- | --- | --- | --- | --- |
| 43.80% | 45.10% | 67.10% | 52.30% | 45.40% | 43.30% |

56.     The Fund's excessive concentration in residential mortgage-backed securities resulted from its investments in non-agency CMOs.  The mortgage-backed securities included in the Index, however, are limited to "agency fixed-rate and hybrid ARM pass-throughs"; the Index did not include non-agency mortgage-backed issues, which do not have the backing of any government-sponsored entities.

57.     Subsequent analyses of other bond index funds that represent that they track the Index indicates that as of February 29, 2008, the Lehman Government Index had a 0% weighting in non-agency mortgage-backed securities, and a 37% weighting in agency mortgage-backed securities.

58.     The Fund thus was converted from a diversified fund that would seek to track the Index into a concentrated real-estate bond fund.  In other words, defendants changed a fundamental investment policy of the Fund without holding the required shareholder vote.

59.     Nonetheless, the Fund largely tracked the Index until August 31, 2007.  From August 31, 1997, through August 31, 2007, the Fund substantially performed in a manner that was consistent with the Index, returning an annualized rate of 5.75% compared to 6.04% for the Index – within the 10% deviation anticipated by the Investment Manager.

60.     As stated in the Fund's annual and semi-annual reports, this degree of deviation between the Fund and the Index occurred "mainly because, unlike the Index, the Fund incurs operating expenses and trading costs and must keep a small part of its assets in cash for paying expenses and processing shareholder orders."

61.     As discussed below at ¶¶ 69-73, the Fund's performance would substantially deviate from the Index beginning in the Fall of 2007 and sustain large losses as a result of the Fund's concentrations in residential mortgage-backed securities.

62.     The Fund's underperformance against the Index continued past February 29, 2008. *From August 31, 2007, through February 27, 2009, the Fund experienced a negative total return of 4.80% compared to a positive 7.85% total return for the Index – a total underperformance of 12.64% in absolute terms (including interest payments) and representing over $100 million in lost value*.

63.     The following chart, prepared on a Bloomberg terminal and comparing the Fund's change in total return to the Lehman Index's change in total return over the period December 31, 2004, through February 27, 2009, demonstrates how closely correlated the Fund was to the Index until approximately August 31, 2007, and how dramatically the Fund deviated from the Index thereafter:



**D.      Defendants Also Violated the Fund's No-Concentration Policy**

64.     As noted above, the Fund's SAIs prohibited the Fund from concentrating more than 25% of its assets in any one industry (except as required by the Index).  The Fund could not deviate from this policy without first obtaining approval from a majority of shareholders.

65.     Until September 1, 2006, the Fund's SAIs considered non-agency CMOs to constitute a single "industry" subject to the concentration limit:

> Based on the characteristics of mortgage-backed securities, each fund has identified mortgage-backed securities issued by private lenders and not guaranteed by U.S. government agencies or instrumentalities as a separate industry for purposes of a fund's concentration policy.

66.     But then, without holding a shareholder vote, the SAI amended September 1, 2006, indicated that the Fund *reversed* its conclusion that mortgage-backed securities comprised "a particular industry" and revised the description of "concentration":

> The funds have determined that mortgage-backed securities issued by private lenders do not have risk characteristics that are correlated to any industry and, therefore, the funds have determined that mortgage-backed securities issued by private lenders are not part of any industry for purposes of the funds' concentration policies.  This means that a fund may invest more than 25% of its total assets in privately-issued mortgage-backed securities, which may cause the fund to be more sensitive to adverse economic, business or political developments that affect privately-issued mortgage-backed securities.  Such developments may include changes in interest rates, state or federal legislation affecting residential mortgages and their issuers, and changes in the overall economy.

67.     With respect to another Schwab fund that shared the *same* SAI as the Schwab Total Bond Market Fund, the Honorable William Alsup of this Court has ruled, notwithstanding defendants' effort to change the definition in this manner, that the prior no-concentration policy must be honored and that the limit may be exceeded only after a shareholder vote.  *In re Charles Schwab Corp. Sec. Litig.*, Order Re: 1940 Act Summary Judgment Motions, Cause No. C-08-01510 WHA (Dkt. No. 538, Mar. 30, 2010).

68.     As shown in the table below, the Fund's non-agency CMO concentrations exceeded 25% of net assets by May 31, 2007, thereby violating the Fund's no-concentration policy that the Fund would not invest more than 25% of its assets in any one industry (except as required by the Index).

| Nov. 30, 2006 | Feb. 28, 2007 | May 31, 2007 | Nov. 30, 2007 | Feb. 29, 2008 | May. 31, 2008 |
|---|---|---|---|---|---|
| 17.40% | 17.70% | 32.00% | 30.00% | 27.30% | 13.20% |

**E.     The Fund's Deviations From the Fund's Fundamental Policies Caused the Performance Deviation and Consequent Damage**

69.     The Fund's deviation in performance from the Index was caused by the Fund's gross deviation from its fundamental investment and no-concentration policies.

70.     The CMOs in the Fund's portfolio were not issued by government agencies.  Rather, they were issued by financial institutions through subsidiaries and backed by residential loans that did not conform to the agencies' higher loan underwriting requirements.

71.     Moreover, non-agency CMOs purchased for the Fund represented tranches of mortgage-backed securities, such as principal only or interest only payments, and were significantly more risky than the agency-issued mortgage-backed securities that were part of the Index.  Included in the Fund's portfolio were CMOs sponsored by such subprime lenders as Citigroup, Merrill Lynch, Countrywide, Bear Stearns, IndyBank, Lehman, and Washington Mutual.

72.     The Fund's concentrated investments in CMOs were made at a time when there was increased concern with the quality of mortgage lending.  For example, on June 28, 2007, the Department of Treasury, Federal Reserve System, Federal Deposit Insurance Corp., and National Credit Union Administration, issued a joint Statement on Subprime Mortgage Lending "to address subprime mortgage products and lending practices."

73.     The riskier non-agency CMO investments caused the Fund's NAV to drop throughout most of 2008 as reflected in the following chart:



## V.    CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3), individually and on behalf of a class consisting of all person or entities

who owned shares of the Fund on May 31, 2007.  Excluded from the Class are the defendants

herein, any subsidiaries or affiliates of the defendants in which defendants or its affiliates have a

controlling ownership interest, officers and directors of any of the defendants, heirs, successors and

assigns of any of the defendants or their officers and directors, and any entity in which any

defendant has a controlling ownership interest.

75.     The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of members of the Class is unknown to Plaintiff at this time

and can only be ascertained through appropriate discovery, Plaintiff believes that there are tens-of-

thousands of members of the proposed Class if not more given that the Fund had over $1.3 billion

in assets as of January 1, 2007.  Record owners and other members of the Class may be identified

from records maintained by the Registrant or its transfer agent and may be notified of the pendency

of this action by mail.

76.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of the

California Unfair Competition Law.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the Trust deviated from one or more investment objectives or policies that could only be changed by a shareholder vote without first obtaining such approval;

(b)     Whether the Trust concentrated investments in the Fund of in excess of 25% of its total assets in any one industry;

(c)     Whether non-agency mortgage-backed securities comprise one or more than one industry;

(d)     Whether agency and non-agency mortgage-backed securities comprise one or more than one industry;

(e)     Whether Schwab or the Investment Advisor caused the Trust to deviate from an investment objective or policy that could only be changed by a shareholder vote;

(f)     Whether defendants' acts as alleged herein violated the ICA;

(g)     Whether the UCL applies to defendants' acts;

(h)     Whether defendants' acts as alleged herein violated the UCL; and

(i)     Whether the members of the Class are entitled to restoration of money that was acquired by means of unlawful business acts and practices.

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by any individual Class member may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in managing this action as a class action.

## VI.     APPLICATION OF CALIFORNIA LAW

80.     Plaintiff and the members of the Class signed account agreements with Schwab stipulating that California law would apply to any disputes that arise thereunder.

FIRST AMENDED COMPLAINT FOR VIOLATION OF UCL        - 19 -

010201-11  412027 v1

81.     In addition, defendants' efforts to deviate from the Fund's fundamental policies without first obtaining shareholder approval was devised, approved, implemented, and managed from defendants' headquarters in San Francisco, California.

82.     Therefore, California law applies to the claims of Plaintiff and all Class members.

**COUNT:**

**VIOLATIONS OF THE CALIFORNIA BUS. & PROF. CODE §§ 17200, ET SEQ.**

83.     Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

84.     Defendants Schwab and the Investment Advisor engaged in "unlawful" business acts and practices in violation of the UCL by violating § 48(a) of the ICA (15 U.S.C. § 80a-47(a)), by causing the Trust and the Fund to violate § 13(a) of the ICA.

85.     Defendants' conduct, as described above, caused the Trust to deviate from the Fund's "fundamental" policies that were changeable only by a shareholder vote that was not held in that, as detailed above:

(a)     Defendants permitted the Fund to deviate from its fundamental investment objective of investing in bond securities that tracked the Lehman Brothers U.S. Aggregate Bond Index; and

(b)     Defendants permitted the Fund to deviate from its fundamental no-concentration policy precluding investment of more than 25% of the Fund's total assets in non-agency mortgage-backed securities.

86.     The Trust's foregoing deviations violated § 13(a) of the Investment Company Act, 15 U.S.C. § 80a-13(a) and, as such, violated California Business & Professions Code § 17200, *et seq.*

87.     The above-noted investments made in violation of stated fundamental investment policies caused significant losses to the Fund's shareholders, as alleged above.  As described above, Plaintiff and other members of the Class have suffered substantial injuries in connection with losses in the Funds' value that resulted from the Funds' deviation from its stated fundamental investment policies.

88. All of the wrongful conduct alleged herein occurred and continues to occur in the conduct of these defendants' businesses. These defendants' wrongful conduct is part of a pattern or generalized course of conduct that has been repeated in the State of California and beyond on a continuing basis. The defendants' conduct thus impacts the public interest.

89. As a proximate result of the defendants' wrongful conduct, Plaintiff sustained damages in connection with losses in the Fund's value that resulted from the Fund's deviation from its stated fundamental investment policies.

90. Plaintiff requests that this Court enter such orders and judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of such unfair competition, as provided in California Business & Professions Code §§ 17203 and Civil Code § 3345, and for such relief as set forth in the Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Plaintiff as a representative of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B. Entry of such orders or judgments as may be necessary to restore to any person in interest any money that may have been acquired by means of unlawful business acts and practices;

C. Disgorging from defendants for the benefit of the Class any management or other fees forfeited by defendants' deviation from the Fund's fundamental investment objectives;

D. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Such equitable, injunctive or other relief as deemed appropriate by the Court.

Dated:  December 2, 2010.

HAGENS BERMAN SOBOL SHAPIRO LLP


By ____/s/ Steve W. Berman_____
          STEVE W. BERMAN (*pro hac vice*)
Sean R. Matt
HAGENS BERMAN SOBOL SHAPIRO
1918 Eighth Avenue, Suite 3300
Seattle, Washington  98101
Telephone:  (206) 623-7929
Facsimile:  (206) 623-0594
steve@hbsslaw.com
sean@hbsslaw.com

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com